**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| CAPROCK INTEGRATED TECHNOLOGIES, LLC <br><br> Plaintiff, <br><br> v. <br><br> ADVANCED MICRO DEVICES, INC., <br><br> Defendant. | Civil Action No. 7:26-cv-00219 <br><br> Jury Trial Requested |

**COMPLAINT FOR PATENT INFRINGEMENT**

Caprock Integrated Technologies, LLC ("Caprock" or "Plaintiff") brings this action for patent infringement against Advanced Micro Devices, Inc. ("AMD" or "Defendant"), for infringement of U.S. Patents Nos. 9,384,086; 10,185,692; and 10,627,888 (collectively, the "Asserted Patents"). Plaintiff, on personal knowledge as to their own acts, and upon information and belief as to all others based on investigation, alleges as follows:

**PARTIES**

1.      Plaintiff Caprock is a limited liability company organized and existing under the laws of the State of Texas with a place of business at 4416 Briarwood Avenue, Ste 110-102, Midland, TX 79707.

2.      Defendant AMD is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 2485 Augustine Drive, Santa Clara, CA 95054, and having a regular and established place of business in the Western District of Texas, including at 7171 Southwest Parkway, Austin, Texas 78735; 7000 West William Cannon Drive, Austin, TX 78735; 1340 Airport Commerce Drive, Austin, TX 78741; and 12301 Research Blvd., Suite 300,

Austin, TX 78759. AMD has been registered to do business in the State of Texas since August 1, 1975, and may be served with process via its registered agent: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.[1]

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code, such that this Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over AMD because AMD conducts business in and has committed acts of patent infringement in this District and the State of Texas and has established minimum contacts with this forum state such that the exercise of jurisdiction over AMD would not offend the traditional notions of fair play and substantial justice. Venue is also proper in this District pursuant to 28 U.S.C. § 1400(b) because AMD has regular and established physical places of business in this District and has committed acts of patent infringement in this District.

5.      AMD has at least six corporate offices in the State of Texas, and maintains numerous regular and established places of business in the Western District of Texas, at 7171 Southwest Parkway, Austin, Texas 78735; at 7000 West William Cannon Drive, Austin, Texas 78735; at 12301 Research Blvd., Suite 300, Austin, Texas 78759; at 8000 Metropolis Drive, Building C, Austin, Texas 78744; and at 1340 Airport Commerce Drive, Austin, Texas 78741.[2]

---

[1] *See Advanced Micro Devices, Inc., Filing History (Filing Number 3778306)*, OFFICE OF THE SECRETARY OF STATE OF TEXAS, https://www.sos.state.tx.us/corp/sosda/index.shtml, (last visited May 19, 2026) (identifying AMD as a registered business organization in Texas with a registered agent in Dallas, Texas).

[2] *See Corporate Locations*, AMD, https://www.amd.com/en/corporate/locations.html (last visited May 19, 2026) (identifying an AMD location at these addresses in Austin, Texas).



6.      AMD maintains a verified official organization account on X (formerly Twitter) at the @AMD handle, which identifies AMD's location as "Austin, TX."[3]

---

[3]      *See also AMD Announces "Advancing AI 2025"*, AMD, https://www.amd.com/en/newsroom/press-releases/2025-4-9-amd-announces-advancing-ai-2025-.html (last visited May 19, 2026) (hyperlinking to "https://twitter.com/amd" as AMD's "Twitter" account).



7.      In other recent patent-infringement actions in this District, AMD has repeatedly conceded or not contested personal jurisdiction. *See, e.g.*, *Adeia Semiconductor Bonding Technologies Inc. et al v. Advanced Micro Devices, Inc.*, Case No. 7:25-cv-510-DC-DTG, Dkt. 29 (AMD Motion to Dismiss); *Adeia Semiconductor Bonding Technologies Inc. et al v. Advanced Micro Devices, Inc.*, Case No. 7:25-cv-511-DC-DTG, Dkt. 39 (AMD Motion to Dismiss); *Redstone Logics LLC, v. Advanced Micro Devices, Inc.*, Case No. 7:25-cv-00182-DC-DTG, Dkt. 15 (AMD Answer) at 4 (W.D. Tex. June 30, 2025) (stating that "AMD does not contest personal jurisdiction in this case"); *Advanced Cluster Sys. Inc., v. Advanced Micro Devices, Inc.*, Case No. 7:24-cv-00244-ADA, Dkt. 29 (AMD Answer) at 2 (W.D. Tex. Jan. 8, 2025) (stating that "AMD does not contest personal jurisdiction in this case").

8.      In addition, AMD has committed acts within the Western District of Texas giving rise to this action and/or has established minimum contacts with the Western District of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

9.      AMD, directly and through subsidiaries or agents (including distributors, retailers, and others), makes, uses, sells, tests, offers for sale, imports, advertises, makes available, and/or

markets the Accused Products (described further below) within the State of Texas and the Western District of Texas that infringe one or more claims of the Asserted Patents.

10.    AMD has placed or contributed to placing infringing products into the stream of commerce including the AMD EPYC 9004 Series Processors, Ryzen 7000 Series Processors, and the Instinct MI300A Processors, with the knowledge and intent that such products would be sold in and purchased and used by customers in the United States, Texas, and this District.

11.    AMD has derived substantial revenues from its infringing acts in the Western District of Texas, including from the sale and use of the Accused Products identified below.

12.    AMD is thus subject to this Court's general and specific jurisdiction, consistent with due process and the Texas Long Arm Statute due at least to AMD's substantial business in the State of Texas and this District, including through its past and ongoing infringing activities, because AMD regularly does and solicits business herein, and/or AMD has engaged in persistent conduct and/or has derived substantial revenues from goods and services provided in the State of Texas and this District.

13.    Venue is likewise proper in this District pursuant to 28 U.S.C. § 1400(b) because AMD has regular and established physical places of business in this District and has committed acts of patent infringement in the District.

14.    AMD has had operations in this District since 1979, when AMD built its first U.S. chip manufacturing facility outside Silicon Valley.[4]

15.    In previous litigation, AMD has admitted that "'the majority of [its] facilities and employees are located in' Austin." *Concurrent Ventures, LLC et al v. Advanced Micro Devices,*

---

[4] Press Release, Advanced Micro Devices, Inc., AMD Opens New Austin Campus (June 16, 2008), https://ir.amd.com/news-events/press-releases/detail/414/amd-opens-new-austin-campus.

*Inc.*, Case No. 4:25-cv-9567-JST, Dkt. 102 (Plaintiffs' Response to Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)) at 13 (N.D. Cal. Sep. 3, 2025) (citing Ramos Dep., 94:7–10, Ex. 65, ¶ 7).

16.    AMD has represented to investors it has "significant operations" in Austin, Texas, demonstrating its ongoing investments in, operational footprint in, and commitment to this forum.[5]

17.    On information and belief, AMD has taken steps to significantly expand its presence and activities in this District.[6] Based on publicly available information, AMD recently announced a $163 million investment in new office space in Austin, Texas.[7] Additionally, based on publicly available information, AMD recently announced a potential $1 billion investment in a 200-acre data center in Rockdale, Texas.[8]

18.    AMD presently employs thousands of employees at its campus and facilities in this District.[9] As of May 2026, AMD has approximately 300 job postings for its Austin locations.[10] Consistent with this District serving as AMD's hub of research, development, and sales operations,

---

[5] *See Advanced Micro Devices, Inc., Annual Report (Form 10-K)* (2026) at 44, https://ir.amd.com/financial-information/sec-filings/content/0000002488-26-000018/amd-20251227.htm, (last visited May 19, 2026) (stating "we have significant operations in Austin, Texas").

[6] *See* Emily Hernandez, *Semiconductor Company AMD Plans $163M Austin Expansion*, MYSANANTONIO (Jan. 16, 2025), https://www.mysanantonio.com/business/article/amd-austin-expansion-20027085.php.

[7] *Id.*

[8] *See* Karoline Leonard, *Global Tech Giant Makes Potential $1 Billion Data Center Deal in Tiny Texas Town*, AUSTIN AMERICAN-STATESMAN (Jan. 21, 2026), https://www.statesman.com/business/technology/article/amd-data-center-rockdale-texas-21305481.php.

[9] *See* Shonda Novak, *AMD Semiconductor Lease Extension Austin Texas Vital Hub*, Austin Am.-Statesman (Dec. 4, 2023), https://www.statesman.com/story/business/real-estate/2023/12/04/amd-semiconductor-lease-extension-austin-texas-vital-hub/71742105007/.

[10] *See* AMD, https://careers.amd.com/careers-home/jobs?stretchUnits=MILES&stretch=10&location=Austin,%20TX&lat=30.26715&lng=-97.74306&woe=7, (last visited May 19, 2026).

AMD is seeking to fill roles in engineering and R&D, corporate operations and management, and marketing and sales. This includes, *e.g.*, hardware design engineering (including GPU power management architecture); design verification engineering; systems design engineering (OS-level software, compilers, network distribution, interconnect micro-architecture); product development engineering; SOC architecture; CPU core engineering; software development engineering (including ML/AI, GPU optimization, performance engineering); firmware engineering; sensor architecture; application engineering; procurement; corporate counsel; supply chain management; product marketing; and product management among others.

19.    On information and belief, AMD engages in the design of semiconductor products—including the Accused Products, which include certain Ryzen™, EPYC™, and Instinct™ product lines described in paragraph 50 below—in this District.[11] In previous litigation, AMD has admitted that the Ryzen™ and EPYC™ product lines are "designed, developed, and tested in the Austin Division" and that "AMD's documents related to the development, design, testing, marketing, and sales of" these product lines are primarily located in Austin. *See Monterey Research, LLC v. Advanced Micro Devices, Inc.*, Case No. 6:21-cv-00840-ADA, Dkt. 44-1 (Thomson Decl.) at 2–3 (W.D. Tex. Dec. 20, 2021). And AMD's job postings in Texas reflect that AMD has located product design and development operations for these product lines in this District, including, *e.g.*, systems architects, firmware, and optimization engineers for the AMD Infinity Data Fabric, including focuses on chiplet designs, cache features, interconnect technologies, and IO architectures used across the accused product lines.

---

[11] *See* Press Release, *McCaul Tours Advanced Micro Devices Campus in Austin*, OFFICE OF REP. MICHAEL MCCAUL (Mar. 14, 2023), https://mccaul.house.gov/media-center/press-releases/mccaul-tours-advanced-micro-devices-campus-austin.

20.    Because AMD has admitted that "documents related to the development, design, testing, marketing, and sales of" the Accused Product lines are primarily located in Austin, AMD also maintains among other things, marketing materials, information about AMD's testing of Accused Products, documentation of AMD's sales and financials related to the Accused Products, and information concerning how the Accused Products work and were developed. On information and belief, such documents and other information are either physically located at AMD's headquarters in this District or electronically maintained and readily accessible in this District with AMD's record custodian located at or near AMD's headquarters in this District.

21.    On information and belief, AMD employs personnel in this District who work directly on the Ryzen, EPYC, and Instinct product lines and who developed, among other things, at least the firmware at issue in this action. In fact, in previous litigation AMD has stated that "there are too many employees in Austin" "involved in the design, development, marketing, and sales" of the Ryzen and EPYC product lines "to name them all." *See Monterey Research*, Case No. 6:21-cv-00840-ADA, Dkt. 44-1 (Thomson Decl.) at 2–3 (W.D. Tex. Dec. 20, 2021).

22.    On information and belief, AMD employs personnel in this District who have developed, and who continue to develop and test, the Accused Products—including (1) Product Development Engineer at AMD;[12] and (2) Senior Product Development Engineer – AMD.[13]

23.    As another example, searches of LinkedIn® reveal over 5,000 individuals located in Texas that, on information and belief, list AMD as their current employer. Further LinkedIn searches reveal 84 individuals who list job titles or experience related to engineering for EPYC products, 42 individuals who list job titles or experience related to engineering for Ryzen products,

---

[12] *See* https://www.linkedin.com/in/cody-horton/, (last accessed May 21, 2026).
[13] *See* https://www.linkedin.com/in/amir-abed/, (last accessed May 21, 2026).

and 97 individuals who list job titles or experience related to engineering for Instinct products—all of which are product families that include the Accused Products. For example, on information and belief, exemplary AMD employees in Austin, Texas with relevant knowledge of the Accused Products include: (1) AMD Chief Architect for future AMD EPYC Datacenter Processors with expertise in chip design, memory and I/O performance, and CPU architectures—technical areas directly relevant to this litigation;[14] (2) Senior Staff System Architect for Ryzen Mobile/Desktop/PRO/Workstation 9000 Series;[15] (3) Director of CPU Microarchitecture with experience as the lead Zen 5/Zen 6 CPU core microarchitecture across EPYC and Ryzen product lines;[16] (4) AMD Chief Architect and Corporate Fellow for Zen who describes himself as "having worked on pretty much every core since" K5 and as the "Father of Zen and in charge of the road map going forward";[17] (5) Corporate Vice President of Engineering Solutions responsible for driving technical initiatives for strategic commercial business growth by engaging with end customers; [18] (6) AMD Senior Fellow—EPYC CPU Performance Architect with experience as the lead performance architect for AMD's 4th generation EPYC Server CPUs;[19] (7) AMD Senior Fellow—Lead SoC Power Architect responsible for power sloshing in APU-dGPU, Modern Standby, Preferred Core & Operating System scheduler, Cstate algorithms, CPPC, world record

---

[14] *See* https://www.linkedin.com/in/kevinlepak/, (last accessed May 19, 2026); *see also ECE Alumnus Kevin Lepak Receives One of Chip Maker AMD's Highest Honors*, UNIV. OF WIS.-MADISON COLL. OF ENG'G (Nov. 1, 2021), https://engineering.wisc.edu/news/ece-alumnus-kevin-lepak-receives-one-of-chip-maker-amds-highest-honors/.

[15] *See* https://www.linkedin.com/in/ronald-baughman-34189748/, (last accessed May 19, 2026).

[16] *See* https://www.linkedin.com/in/riley-dai-6bb103241/, (last accessed May 19, 2026).

[17] *See* https://www.linkedin.com/in/michael-t-clark-62b82ba/, (last accessed May 19, 2026); *see also* George Kozma, *A Video Interview with Mike Clark, Chief Architect of Zen at AMD*, CHIPS AND CHEESE (Jul. 15, 2024), https://chipsandcheese.com/p/a-video-interview-with-mike-clark-chief-architect-of-zen-at-amd.

[18] *See* https://www.linkedin.com/in/laura-baldwin-smith-931b575/, (last accessed May 19, 2026).

[19] *See* https://www.linkedin.com/in/ravi-bhargava-420b285/, (last accessed May 19, 2026).

server power efficiency, deep SoC power states, and others;[20] (8) AMD Design Engineer Fellow;[21] (9) Sr. Product Development Engineer, Instinct AI Accelerators;[22] (10) Technical Program Manager for MI450 (Instinct AI Accelerator Platform) at AMD;[23] and (11) AMD Product Development Fellow specializing in the semiconductor manufacturing process.[24] Further research and discovery will likely produce additional current AMD employees with information relevant to the Accused Products and infringement of the Patents-in-Suit, but the above results show substantial numbers of current AMD employees with knowledge relevant to the claims in this case are located within this District.

24.    On information and belief, AMD is actively expanding its presence and activities in this District. Based on publicly available information, AMD has recently posted a recruitment for an Interconnect Firmware Engineer in Austin, Texas, whose role involves AMD Infinity Data Fabric firmware development across all AMD products, including EPYC, Ryzen, and Instinct.[25] AMD is also recruiting a Firmware Engineer in Austin to "design, develop, debug, and integrate firmware solutions for components in the AMD SOC"[26] and a Firmware Engineer to "lead, debug and integrate firmware solutions for components in Server" product lines.[27]

---

[20] *See* https://www.linkedin.com/in/indrani-paul-45a2084/, (last accessed May 19, 2026).

[21] *See* https://www.linkedin.com/in/rrachala/, (last accessed May 19, 2026).

[22] *See* https://www.linkedin.com/in/jgutierrezp/, (last accessed May 19, 2026).

[23] *See* https://www.linkedin.com/in/manvithapannala/, (last accessed May 19, 2026).

[24] *See* https://www.linkedin.com/in/omarzia2/, (last accessed May 19, 2026).

[25] *See* https://careers.amd.com/careers-home/jobs/76658?lang=en-us, (last accessed May 19, 2026).

[26] *See* https://careers.amd.com/careers-home/jobs/76574?lang=en-us, (last accessed May 19, 2026).

[27] *See* https://careers.amd.com/careers-home/jobs/84706?lang=en-us, (last accessed May 19, 2026).

25.     AMD also employs personnel in Austin, Texas who are responsible for AMD's intellectual property and patent litigation. For example, AMD's Senior Director of Intellectual Property has stated that AMD is looking to hire Patent Litigation Counsel in Austin, Texas.[28]

26.     Additionally, on information and belief, "[i]n recent years, AMD has engaged consultants in … Texas" "to monitor legislation of interest in state legislatures and support its advocacy efforts, further evidencing AMD's sustained engagement with Texas."[29]

27.     On information and belief, AMD has committed acts of infringement in this District, including publicly unveiling the Accused Products at events held in Austin, Texas.[30]

28.     In other recent actions in this District, AMD has either admitted that venue in this District is proper or not contested venue (*e.g.*, via a Rule 12 Motion). *See, e.g.*, *Adeia Semiconductor*, Case No. 7:25-cv-510-DC-DTG; *Adeia Semiconductor*, Case No. 7:25-cv-511-DC-DTG; *Redstone Logics*, Case No. 7:25-cv-00182-DC-DTG, Dkt. 15 (AMD's Answer) at 4 (W.D. Tex. June 30, 2025) (stating that "AMD admits that it has places of business in Austin, TX. … AMD does not contest venue in [the Western District of Texas] in this case.") *Advanced Cluster Sys.*, Case No. 7:24-cv-00244-ADA, Dkt. 29 (AMD's Answer) at 3 (W.D. Tex. Jan. 8, 2025) (stating that "AMD does not contest personal jurisdiction or venue in [the Western District of Texas] in this case … AMD admits that it has places of business in Austin, TX.").

---

[28] *See* https://www.linkedin.com/feed/update/urn:li:activity:7420205497657769984/?originTrackingId =7TfbBSTuY20cXP5u%2BMITBQ%3D%3D, (last accessed May 19, 2026) (Senior Director of Intellectual Property David Parandoosh recruiting Patent Litigation Counsel in Austin, Texas.).
[29] *See Public Policy Engagement and U.S. Political Activities*, AMD, https://www.amd.com/en/corporate/corporate-responsibility/governance/public-policy-engagement.html, (last accessed May 19, 2026).
[30] *See AMD: Ryzen 7000 Zen 4 CPUs Release Next Month and RDNA3 GPUs Teased*, REDSHARK NEWS (Aug. 30, 2022), https://www.redsharknews.com/amd-ryzen-7000-zen-4-cpus-release-next-month-and-rdna3-gpus-teased (describing a presentation held in Austin announcing the Ryzen 7000 which uses its "Zen 4 microarchitecture.")

29.     AMD makes, uses, sells, tests, offers to sell, imports, makes available, and/or markets infringing products into and within this District, including at its Austin locations. AMD maintains a permanent and continuous presence in this District, has the requisite minimum contacts with this forum, and has transacted—and at the time of the filing of this Complaint continues to transact—business within this District. For at least the above reasons, venue is proper in this District.

## THE ASSERTED PATENTS

30.     This complaint asserts causes of action for infringement of United States Patent No. 9,384,086 (the "'086 Patent"); United States Patent No. 10,185,692 (the "'692 Patent"); and United States Patent No. 10,627,888 (the "'888 Patent") (collectively, the "Asserted Patents").

31.     Each of the Asserted Patents contains claims directed to patent-eligible subject matter and is a valid and enforceable U.S. patent, the entire right, title, and interest to which Caprock owns by assignment.

## U.S. Patent No. 9,384,086

32.     U.S. Patent No. 9,384,086 is entitled "I/O Operation-Level Error Checking," and was issued by the U.S. Patent and Trademark Office (the "PTO") to inventors David Craddock, John R. Flanagan, and Thomas A. Gregg on July 5, 2016. Plaintiff holds by assignment all rights and title to the '086 Patent and related patents, including the sole and exclusive right to bring a claim for its infringement. A copy of the '086 Patent is attached as **Exhibit A**.

33.     The '086 Patent generally claims systems, methods, and computer program products for error checking at an input/output ("I/O") operation level, including by tracking and accumulating cyclic redundancy check (CRC) values for I/O operations using an I/O hub. The improvements of the '086 Patent include, among other things, implementations of I/O error-

checking that improve over other solutions such as software generation and checking (which can impose software overhead like performance and CPU utilization penalties) and adapter offloading (which can occur too far from the application and lack protocol support).

34.     To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '086 Patent.

35.     AMD is not licensed to practice the '086 Patent in either an express or implied manner, nor does it enjoy or benefit from any rights in or to the '086 Patent whatsoever.

### U.S. Patent No. 10,185,692

36.     U.S. Patent No. 10,185,692 is entitled "Monitoring Use of Specialized Hardware Components (SHC) of Processors in Heterogeneous Environments by Storing Event Counts During Execution" and was issued by the PTO to inventors Shakti Kapoor, Grace Y. Liu, and Karen E. Yokum on January 22, 2019. Plaintiff holds by assignment all rights and title to the '692 Patent, including the sole and exclusive right to bring a claim for its infringement. A copy of the '692 Patent is attached as **Exhibit B**.

37.     The '692 Patent generally claims apparatuses, methods, and computer-readable media for tracking use of a specialized hardware component in a multiprocessing computing device, including by allocating counting registers for storing counts of events related to the specialized hardware component, detecting events, and updating counting registers. The improvements of the '692 Patent include, among other things, hardware usage detection, tracking, and reporting with bus-level memory coherence.

38.     To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '692 Patent.

39.     AMD is not licensed to practice the '692 Patent in either an express or implied manner, nor does it enjoy or benefit from any rights in or to the '692 Patent whatsoever.

**U.S. Patent No. 10,627,888**

40.     U.S. Patent No. 10,627,888 is entitled "Processor Power-Saving During Wait Events," and was issued by the PTO to inventors Raymond M. Higgs, Luke M. Hopkins, and Mushfiq Saleheen on April 21, 2020. Plaintiff holds by assignment all rights and title to the '888 Patent, including the sole and exclusive right to bring a claim for its infringement. A copy of the '888 Patent is attached as **Exhibit C**.

41.     The '888 Patent generally claims a method of optimizing power consumption in an electrical device, including by receiving instructions to enter a wait state, identifying parameters associated with the instructions, initiating instructions to enter and exit a low-power mode based on the parameters, and providing a user with notice of the current state. The improvements of the '888 Patent include, among other things, intelligent decision-making for power state transitions (for example, entry into and exit from low-power mode during wait states) using a sleep decision index.

42.     To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '888 Patent.

43.     AMD is not licensed to practice the '888 Patent in either an express or implied manner, nor does it enjoy or benefit from any rights in or to the '888 Patent whatsoever.

**AMD'S USE OF THE PATENTED TECHNOLOGY**

44.     On information and belief, AMD makes, uses, sells, tests, offers to sell, makes available, and/or markets in the United States, and/or imports into the United States computing products including central processing units ("CPUs") and/or graphics processing units ("GPUs")

for desktops, laptops, servers, and embedded systems that practice one or more claims of one or more of the Asserted Patents (the "Accused Products").

45.    As one non-limiting example, AMD makes, uses, sells, tests, offers to sell, makes available, and/or markets in the United States, and/or imports into the United States the AMD Ryzen 7000 Series ("Raphael") processors featuring Zen 4-based Systems-on-a-Chip (SoCs), *e.g.*, one or more integrated circuits that combine multiple computing components, such as a CPU, memory controller, and I/O interfaces. These processors also integrate RDNA 2 GPUs. The AMD Ryzen 7000 Series products implement the solutions claimed by one or more claims of the '086, '692, and '888 Patents.

46.    Similarly, AMD makes, uses, sells, tests, offers to sell, makes available, and/or markets in the United States, and/or imports into the United States the AMD EPYC 9004 Series ("Genoa") processors featuring Zen 4-based Systems-on-a-Chip (SoCs), *e.g.*, one or more integrated circuits that combine multiple computing components, such as a CPU, memory controller, and I/O interfaces. The AMD EPYC 9004 Series products implement the solutions claimed by one or more claims of the '086 and '888 Patents.

47.    Similarly, AMD makes, uses, sells, tests, offers to sell, makes available, and/or markets in the United States, and/or imports into the United States the AMD Ryzen 6000 Series ("Rembrandt") processors featuring Zen 3+-based Systems-on-a-Chip (SoCs), *e.g.*, one or more integrated circuits that combine multiple computing components, such as a CPU, memory controller, and I/O interfaces. These processors also integrate RDNA 2 GPUs. The AMD Ryzen 6000 Series products implement the solutions claimed by one or more claims of the '086 and '692 Patents.

48.    Similarly, AMD makes, uses, sells, tests, offers to sell, makes available, and/or markets in the United States, and/or imports into the United States the AMD EPYC 7003 Series ("Milan") processors featuring Zen 3-based Systems-on-a-Chip (SoCs), *e.g.*, one or more integrated circuits that combine multiple computing components, such as a CPU, memory controller, and I/O interfaces. The AMD EPYC 7003 Series products implement the solutions claimed by one or more claims of the '086 Patent.

49.    Similarly, AMD makes, uses, sells, tests, offers to sell, makes available, and/or markets in the United States, and/or imports into the United States the AMD Instinct MI300A accelerated processing units which integrate "Zen 4" CPU cores with CDNA3 GPU compute units in multi-chip architecture. The AMD Instinct MI300A accelerated processing units implement the solutions claimed by one or more claims of the '692 Patent.

50.    The Accused Products thus include AMD EPYC 9005 Series ("Turin"), AMD EPYC 9004 Series ("Genoa"), AMD EPYC 97x4 Series ("Bergamo"), AMD EPYC 8004 Series ("Siena"), AMD EPYC 7003 Series ("Milan"), AMD EPYC 7002 Series ("Rome"), AMD EPYC 4005 Series ("Grado"), AMD EPYC 4004 Series ("Raphael"), AMD EPYC 2005 Series ("Fire Range"), AMD Ryzen 9000 Series ("Granite Ridge"), AMD Ryzen 9000 Series ("Fire Range"), AMD Ryzen 8000G Series ("Phoenix"), AMD Ryzen 8040 Series ("Hawk Point"), AMD Ryzen 8000HX Series ("Dragon Range Refresh"), AMD Ryzen 7000 Series ("Raphael"), AMD Ryzen 7020 Series ("Mendocino"), AMD Ryzen 7030 Series ("Barcelo-R"), AMD Ryzen 7035 Series ("Rembrandt-R"), AMD Ryzen 7040 Series ("Phoenix"), AMD Ryzen 7045 Series ("Dragon Range"), AMD Ryzen 6000 Series ("Rembrandt"), AMD Ryzen 5000 Series ("Vermeer"), AMD Ryzen 5000 Series ("Cezanne"), AMD Ryzen 5000 Series ("Lucienne"), AMD Ryzen 4000 Series ("Renoir"), AMD Ryzen 3000 Series ("Matisse"), AMD Ryzen AI 400 Series ("Gorgon Point"),

AMD Ryzen AI Max 300 Series ("Strix Halo"), AMD Ryzen AI 300 Series ("Strix"), AMD Ryzen 200 Series ("Phoenix-Derived"), AMD Ryzen 100 Series ("Rembrandt-Derived"), AMD Ryzen 10 Series ("Mendocino-Class"), AMD Ryzen Embedded V2000 Series ("Grey Hawk"), AMD Ryzen Z1 Series ("Phoenix"), AMD Ryzen Z2 Series ("Strix"), AMD Ryzen Threadripper 9000 Series ("Shimada Peak"), AMD Ryzen Threadripper 7000 Series ("Storm Peak"), AMD Ryzen Threadripper 5000 Series ("Chagall"), AMD Ryzen Threadripper 3000 Series ("Castle Peak"), AMD Athlon Series ("Mendocino"), AMD Instinct MI350 Series, AMD Instinct MI300 Series, AMD Instinct MI200 Series, AMD Instinct MI100 Series, AMD Instinct MI50 Series, AMD Instinct MI60 Series, AMD Instinct MI25 Series, AMD Instinct MI8 Series, and AMD Instinct MI6 Series. A complete list of Accused Products known to Caprock at this time is included as **Exhibit D**.

**COUNT 1:**
**INFRINGEMENT OF U.S. PATENT NO. 9,384,086**

51. Caprock repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

52. AMD has directly infringed and continues to directly infringe the '086 Patent in violation of 35 U.S.C. § 271(a) by, either literally or through the doctrine of equivalents, making, using (including internal use and testing), selling, offering to sell, making available, marketing, and/or importing in or into the United States, without authorization, products that practice one or more claims of the '086 Patent, including at least exemplary Claim 1 as set forth below.

53. For example, Claim 1 of the '086 Patent recites as follows:

1. A system for facilitating error checking in a computing environment, the system comprising:

a memory;

> a processing device communicatively coupled to the memory, wherein the system performs a method comprising:
>
>> based on a command to perform an input/output (I/O) operation of the computing environment, associating, by an I/O hub of the computing environment, a cyclic redundancy check (CRC) control element (CCE) with the I/O operation; and
>>
>> using, by the I/O hub, the CRC control element in accumulating with performance of the I/O operation an accumulated CRC value for the I/O operation to facilitate error checking of the I/O operation.

54.     The exemplar AMD EPYC 7003 device made and sold by AMD meets every element of this claim.[31] At a minimum, the '086 Patent Accused Products include AMD EPYC 9005 Series ("Turin"), AMD EPYC 9004 Series ("Genoa"), AMD EPYC 97x4 Series ("Bergamo"), AMD EPYC 8004 Series ("Siena"), AMD EPYC 7003 Series ("Milan"), AMD EPYC 7002 Series ("Rome"), AMD EPYC 4005 Series ("Grado"), AMD EPYC 4004 Series ("Raphael"), AMD EPYC 2005 Series ("Fire Range"), AMD Ryzen 9000 Series ("Granite Ridge"), AMD Ryzen 9000 Series ("Fire Range"), AMD Ryzen 8000G Series ("Phoenix"), AMD Ryzen 8040 Series ("Hawk Point"), AMD Ryzen 8000HX Series ("Dragon Range Refresh"), AMD Ryzen 7000 Series ("Raphael"), AMD Ryzen 7020 Series ("Mendocino"), AMD Ryzen 7030 Series ("Barcelo-R"), AMD Ryzen 7035 Series ("Rembrandt-R"), AMD Ryzen 7040 Series ("Phoenix"), AMD Ryzen 7045 Series ("Dragon Range"), AMD Ryzen 6000 Series ("Rembrandt"), AMD Ryzen 5000 Series ("Vermeer"), AMD Ryzen 5000 Series ("Cezanne"), AMD Ryzen 5000 Series ("Lucienne"), AMD Ryzen 4000 Series ("Renoir"), AMD Ryzen 3000 Series ("Matisse"), AMD Ryzen AI 400 Series ("Gorgon Point"), AMD Ryzen AI Max 300 Series ("Strix Halo"), AMD Ryzen AI 300 Series ("Strix"), AMD Ryzen 200 Series ("Phoenix-

---

[31] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which the AMD EPYC 7003 infringes.

Derived"), AMD Ryzen 100 Series ("Rembrandt-Derived"), AMD Ryzen 10 Series ("Mendocino-Class"), AMD Ryzen Embedded V2000 Series ("Grey Hawk"), AMD Ryzen Z1 Series ("Phoenix"), AMD Ryzen Z2 Series ("Strix"), AMD Ryzen Threadripper 9000 Series ("Shimada Peak"), AMD Ryzen Threadripper 7000 Series ("Storm Peak"), AMD Ryzen Threadripper 5000 Series ("Chagall"), AMD Ryzen Threadripper 3000 Series ("Castle Peak"), AMD Athlon Series ("Mendocino").

55.     The Accused Products include and comprise a system for facilitating error checking in a computing environment. As one non-limiting example, AMD EPYC 7003 processors are deployed within server computing platforms and include a system for facilitating error checking in such computing environment comprising processors, memory subsystems, and input/output ("I/O") resources interconnected through AMD's Infinity Fabric architecture. AMD EPYC 7003 processors incorporate, among other things, the Machine Check Architecture ("MCA"), a hardware and software mechanism that detects, logs, and reports hardware errors to the operating system. The MCA provides a mechanism for detecting and reporting hardware (machine) errors, including errors such as system bus errors, ECC errors, parity errors, cache errors, and translation lookaside buffer errors. The MCA utilizes a set of model-specific registers ("MSRs") that are used to set up machine checking and additional banks of MSRs for recording errors that are detected. Among their functionalities, these facilities enable system software to recover from and diagnose hardware errors.

56.     The Accused Products include and comprise a system comprising a memory. As one non-limiting example, AMD EPYC 7003 processors include multiple levels of memory. For instance, within each Core Complex ("CCX"), CPU cores contain L1 cache (comprising 32 KB instruction cache and 32 KB data cache per core) and L2 cache (512 KB per core). Each CCX

contains an L3 cache shared among its cores (up to 32 MB in standard configurations, or up to 96 MB per CCX in models with AMD 3D V-Cache technology). AMD EPYC 7003 processors further include DDR4 system memory accessed through unified memory controllers ("UMCs") located on the I/O die ("IOD").

| Table 1: The multi-die architecture has enabled significant improvements for each processor generation since the beginning | | | | |
|---|---|---|---|---|
| | AMD EPYC 7001 'NAPLES' | AMD EPYC 7002 'ROME' | AMD EPYC 7003 'MILAN' | AMD EPYC 9004, 8004 'GENOA', 'SIENA' |
| Core Architecture | 'Zen' | 'Zen 2' | 'Zen 3' | 'Zen 4' and 'Zen 4c' |
| Cores | 8 to 32 | 8 to 64 | 8 to 64 | 8 to 128 |
| IPC Improvement Over Prior Generation | N/A | ~24% ROM-236 | ~19% MLN-003 | ~14% EPYC-038 |
| Max L3 Cache | Up to 64 MB | Up to 256 MB | Up to 256 MB | Up to 384 MB (EPYC 9004) Up to 128 MB (EPYC 8004) |
| Max L3 Cache with 3D V-Cache™ technology | | | 768 MB | Up to 1152 MB |
| PCIe® Lanes | Up to 128 Gen 3 | Up to 128 Gen 3 | Up to 128 Gen 4 | Up to 128 Gen 5 8 bonus lanes Gen 3 |
| CPU Process Technology | 14nm | 7nm | 7nm | 5nm |
| I/O Die Process Technology | N/A | 14nm | 14nm | 6nm |
| Power (Configurable TDP [cTDP]) | 120-200W | 120-280W | 155-280W | 70-400W |
| Max Memory Capacity | 2 TB DDR3-2400/2666 | 4 TB DDR4-3200 | 4 TB DDR4-3200 | 6 TB DDR5-4800 |

**AMD**

together we advance_data center computing    READY TO CONNECT? Visit explore.amd.com/server-newsletter/sign-up    4

4th Gen AMD EPYC Processor Architecture White Paper (Sept. 2023) ("EPYC September 2023 White Paper"), p. 4

57.    The Accused Products include and comprise a system comprising a processing device communicatively coupled to the memory. As one non-limiting example, AMD EPYC 7003 processors contain multiple Zen 3 CPU cores (processing devices). The Zen 3 CPU cores are communicatively coupled to memory (*e.g.*, caches) through AMD's Infinity Fabric interconnect. CPU cores reside on Core Complex Dies ("CCDs"), and each CCD connects to the IOD through dedicated high-speed Infinity Fabric On-Package ("IFOP") links, also referred to as the Global

Memory Interconnect ("GMI"). The IOD contains UMCs that provide the CCDs with access to L3 cache and DDR4 system memory.



AMD EPYC 7003 Series Processor Microarchitecture Overview
(Pub. 57075 Rev. 3.0—Mar. 2022) ("EPYC 7003 Overview"), § 2.2, p. 4

58.    The Accused Products include and comprise a system wherein the system performs a method comprising, based on a command to perform an I/O operation of the computing environment, associating, by an I/O hub of the computing environment, a cyclic redundancy check ("CRC") control element ("CCE") with the I/O operation. As one non-limiting example, AMD EPYC 7003 processors comprise a Zen 3-based system on a chip ("SoC") that includes an I/O hub within the architecture. The IOD implements many functions that would otherwise require external chipsets, such as DDR memory controllers, PCIe controllers, SATA disk controllers, Compute Express Link ("CXL") controllers, and AMD Infinity Fabric interconnects, thereby constituting a SoC. The I/O hub performs I/O operations through Serializer/Deserializer ("SerDes") interfaces, PCIe links, and Infinity Fabric links (*e.g.*, Infinity Fabric On-Package, Infinity Fabric Inter-Socket, among other links). AMD EPYC 7003 processors contain the Coherent AMD socKet Extender ("CAKE") component within the Data Fabric, which encodes local requests onto 128-bit serialized

packets each cycle and transmits them over the Infinity Fabric. When an I/O operation occurs—

such as data transfer through the CAKE component over SerDes interfaces—a CRC is associated

with that I/O operation.

| CRC32 | CRC32 Cyclical Redundancy Check |
|---|---|

Performs one step of a 32-bit cyclic redundancy check.

The first source, which is also the destination, is a doubleword value in either a 32-bit or 64-bit GPR depending on the presence of a REX prefix and the value of the REX.W bit. The second source is a GPR or memory location of width 8, 16, or 32 bits. A vector of width 40, 48, or 64 bits is derived from the two operands as follows:

1. The low-order 32 bits of the first operand is bit-wise inverted and shifted left by the width of the second operand.

2. The second operand is bit-wise inverted and shifted left by 32 bits

3. The results of steps 1 and 2 are xored.

This vector is interpreted as a polynomial of degree 40, 48, or 64 over the field of two elements (i.e., bit $i$ is interpreted as the coefficient of $X^i$). This polynomial is divided by the polynomial of degree 32 that is similarly represented by the vector 11EDC6F41h. (The division admits an efficient iterative implementation based on the xor operation.) The remainder is encoded as a 32-bit vector, which is bit-wise inverted and written to the destination. In the case of a 64-bit destination, the upper 32 bits are cleared.

In an application of the CRC algorithm, a data block is partitioned into byte, word, or doubleword segments and CRC32 is executed iteratively, once for each segment.

AMD64 Architecture Programmer's Manual Volume 3
(Pub. 24594 Rev. 3.37—July 2025) ("AMD64 Manual Vol. 3"), p. 174

The CRC is transmitted with every cycle of data on both Infinity Fabric On-Package ("IFOP")

links (for, *e.g.*, intra-package communication between CCDs and the IOD, among other things)

and Infinity Fabric Inter-Socket ("IFIS") links (for, *e.g.*, socket-to-socket communication between

devices).

22



## 2.4    I/O Die (Infinity Fabric™)

The CCDs connect to memory, I/O, and each other through the I/O Die (IOD). Each CCD connects to the IOD via a dedicated high-speed Global Memory Interconnect (GMI) link. The IOD also contains memory channels, PCIe® Gen4 lanes, and Infinity Fabric links. All dies (or chiplets) interconnect with each other via AMD's Infinity Fabric Technology. The fabric clock (FCLK) can now run up to 1600Mhz and thus be coupled with DDR4-3200 Memory DIMMs, which also run at 1600MHz (MEMCLK), further improving memory latency.

Figure 2-4: AMD EPYC 7003 Series Processor internal CCD, I/O, and Unified Memory Controller (UMC) topology to AMD Infinity Fabric

EPYC 7003 Overview, § 2.4, p. 5

59.    The Accused Products include and comprise a system wherein the system performs a method comprising, using, by the I/O hub, the CRC control element in accumulating with performance of the I/O operation an accumulated CRC value for the I/O operation to facilitate error checking of the I/O operation. As one non-limiting example, in AMD EPYC 7003 processors the I/O hub performs CRC accumulation during I/O operations. As data is transmitted over Infinity Fabric links (both IFOP and IFIS), the CRC value is computed and accumulated as each data segment is processed. The accumulated CRC value is transmitted along with each cycle of data, enabling the receiving component to compare the computed CRC against the received CRC to detect transmission errors.

> To support the high reliability required by server systems, CRC is transmitted along with every cycle of data. The IFOP SerDes transmission bitrate is 4 transfers

*See, e.g.*, Noah Beck et al., *"Zeppelin": An SoC for Multichip Architectures* (2018) ("Zeppelin ISSCC Paper"), § 2.4, p. 40

This CRC mechanism operates as part of AMD's Reliability, Availability, and Serviceability ("RAS") features for the Infinity Fabric interconnect, providing link packet CRC with retry capability.

**RELIABILITY, AVAILABILITY, AND SERVICEABILITY**

AMD EPYC processors are built with RAS features that increase their own reliability, availability, and serviceability and that of the platform in which they run.

RELIABILITY is the rate at which the CPU successfully completes work–if its calculations produce incorrect results, it becomes less than 100% reliable. AMD EPYC processors are designed with thousands of self-checking circuits that enable the processor to continue accomplishing work without interruption.

System memory is a significant source of errors in a typical platform. Two features that contribute to platform reliability are the processor's ability to overcome memory errors:

- AMD ADVANCED MEMORY DEVICE CORRECTION (AMDC) goes beyond standard ECC DRAM by using a type of ECC that allows large groups of bits to be corrected with negligible performance impact. Similar to Chipkill, this helps prevent a bad DRAM device on a DIMM from causing application problems. AMDC helps increase server reliability and availability by enabling DIMMs with errors to remain in service.

- DRAM READ UECC RETRY AND DRAM ADDRESS AND COMMAND PARITY WITH REPLAY help to overcome transient memory bus errors by replaying requests that presented errors, helping to maintain high levels of service.

5th Gen AMD EPYC Processor Architecture White Paper
(Pub. LE-91401-00, First Ed.—Oct. 2024) ("5th Gen EPYC Architecture"), p. 13

If a CRC error is detected, the Infinity Fabric can initiate a retry of the failed transmission. Additionally, the memory subsystem employs DRAM write CRC with replay capability for memory operations, where CRC errors detected during memory writes trigger a replay of the failed operation. These CRC mechanisms facilitate error checking by enabling comparison to detect and correct errors during or after I/O operations across multiple subsystems, including Infinity Fabric links and memory controllers.

24

Using **NUMA Nodes Per Socket** (NPS) BIOS setting, a system can be setup with different NUMA configurations.

If for example we set NPS=4, as shown in Figure 2-5 above, we can divide the processor into quadrants. Each quadrant would have 2 CCDs, 2 UMCs, and 1 I/O Hub as drawn in Figure 2-5. The closest processor memory-I/O distance is between the cores, memory controllers, and I/O within the same quadrant. The furthest distance is between a core and memory controller or IO hub in diagonal quadrants. Locality of cores, memory, and IO in a NUMA-based system is an important aspect when tuning for performance.

EPYC 7003 Overview, § 2.6, p. 6



Figure 2-5: EPYC 7003 System on Chip (SoC) consists of 8 CCDs and central IOD

EPYC 7003 Overview, § 2.5, p. 6



EPYC September 2023 White Paper, p. 10

25

> Within the Infinity Fabric (IF), the Scalable Data Fabric (SDF) plane is designed to provide the coherent data transport between cores using the cache-coherent master (CCM), memory using the unified memory controller (UMC), and IO using the IO master/slave (IOMS) (Fig. 2.4.2). The chip-to-chip communication method

*See also*, *e.g.*, Zeppelin ISSCC Paper, § 2.4, p. 40

60.     By making, using, offering for sale, selling, testing, making available, and/or marketing products in the United States, and/or importing products into the United States, including but not limited to the Accused Products, AMD has injured Caprock and is liable to Caprock for directly infringing one or more claims of the '086 Patent, including at least Claim 1, pursuant to 35 U.S.C. § 271(a).

61.     In addition to direct infringement, AMD also indirectly infringes the '086 Patent under 35 U.S.C. § 271(b). AMD has actively encouraged and taken active steps and overt acts to encourage its customers to directly infringe the '086 Patent by using, selling, testing, offering for sale, making available, marketing, and/or importing the Accused Products or products containing the Accused Products. AMD through its sales, engineering, marketing, and technical staff, as well as its Partner Network, actively encourages its customers to purchase the infringing Accused Products, use the Accused Products in a manner that directly infringes, and/or incorporate the Accused Products into customers' own products. AMD also actively encourages and facilitates direct infringement by providing ongoing technical support for the Accused Products, including driver and firmware updates that further enable direct infringement by AMD's customers. AMD also provides its customers with detailed technical documentation, white papers, tuning guides, architecture overviews, product briefs, and marketing materials that instruct and encourage customers to deploy and use the Accused Products in configurations where the patented error checking functionality is performed, thereby directly infringing the '086 Patent. AMD's own

26

technical literature describes how CRC values are transmitted with data over Infinity Fabric links to detect and correct transmission errors—the same error checking functionality claimed by the '086 Patent. AMD also purposefully and knowingly sells and offers to sell the Accused Products to its distributors, contract manufacturers, and/or customers knowing and expecting that the Accused Products or products containing them will be imported, used, sold, and/or offered for sale by those distributors, contract manufacturers, customers, and/or other end users. As a result of AMD's active encouragement and intentional inducement, its customers have committed acts directly infringing the '086 Patent.

62.    AMD has known of the '086 Patent and, on information and belief, that AMD's customers' acts constituted direct infringement of at least one claim of the '086 Patent since at least January 29, 2026.

63.    During prosecution of applicant AMD's U.S. Patent Application No. 18/374,311 (filed on September 28, 2023, and subsequently issued as U.S. Patent Application Publication No. 2025/0110819 A1 on April 3, 2025), the examiner on January 29, 2026 cited the '086 Patent as anticipating approximately a dozen pending claims. The applicant amended the claims to add additional subject matter and sought to traverse the examiner's conclusion that Craddock anticipated the claims as written. By substantively addressing the '086 Patent in its own patent application with the United States Patent and Trademark Office, AMD was notified of, reviewed, and analyzed the '086 Patent and its claims.

64.    Despite this knowledge, AMD intends to cause, and has taken affirmative steps to induce, infringement by distributors, contract manufacturers, customers, and/or other end users by at least, *inter alia*, encouraging, promoting, instructing, and/or directing the infringing use of the Accused Products as detailed above.

65.     At a minimum, AMD had knowledge of the '086 Patent and its infringement at least as of the filing of this complaint, and its continued support for and instructions and active encouragement to use the Accused Products constitutes indirect infringement of the '086 Patent.

66.     AMD's continued infringement of the '086 Patent since at least January 29, 2026 has been and continues to be deliberate and willful.

67.     In the alternative, AMD has been aware of the '086 Patent since at least the filing of this complaint.

68.     As detailed above, the AMD EPYC 7003 and other Accused Products infringe at least Claim 1 of the '086 Patent. Accordingly, by encouraging, promoting, instructing, and/or directing users to use the AMD EPYC 7003 and other Accused Products, AMD is actively inducing infringement of the '086 Patent in violation of 35 U.S.C. § 271(b).

69.     AMD is likewise liable as a contributory infringer of the '086 Patent under 35 U.S.C. § 271(c). AMD has offered to sell and/or sold within the United States the AMD EPYC 7003 Series and other Accused Products that practice the '086 Patent. The Accused Products comprise systems for error checking at an input/output ("I/O") operation level, which constitutes a material part of the '086 Patent's invention, that can be incorporated into computing systems, servers, and other computing devices. AMD has known such Accused Products to be especially adapted for practicing at least one claim of the '086 Patent, where the Accused Products are not staple articles nor a commodity of commerce suitable for substantial non-infringing use.

70.     As a result of AMD's infringement of the '086 Patent, Caprock has suffered and will continue to suffer monetary damages and seeks recovery in an amount adequate to compensate for AMD's past, present, and future infringement, but in no event less than a reasonable royalty,

together with pre- and post-judgment interest, attorneys' fees, and costs as fixed by the Court under 35 U.S.C. §§ 284 and 285.

## COUNT 2:
## INFRINGEMENT OF U.S. PATENT NO. 10,185,692

71.     Caprock repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

72.     AMD has directly infringed and continues to directly infringe the '692 Patent in violation of 35 U.S.C. § 271(a) by, either literally or through the doctrine of equivalents, making, using (including internal use and testing), selling, offering to sell, making available, marketing, and/or importing in or into the United States, without authorization, products that practice one or more claims of the '692 Patent, including at least exemplary Claim 1 as set forth below.

73.     For example, Claim 1 of the '692 Patent recites as follows:

1. An apparatus comprising:

> a central processing component (CPC) having a computing core;

> a coherent memory bus coupled to the CPC;

> a memory coupled to the coherent memory bus;

> a communication bus coupled to the coherent memory bus;

> a specialized hardware component (SHC) coupled to the communication bus; and

> a SHC tracker coupled to the coherent memory bus, the SHC tracker configured to:

> > allocate a counting register for storing a count of events of the SHC;

> > detect an event of the SHC;

29

> update the counting register with a count related to the event of the SHC; and

> send counts from the counting register to another apparatus.

74. The exemplar AMD Instinct MI300A device made and sold by AMD meets every element of this claim.[32] At a minimum, the Accused Products include AMD products that incorporate integrated GPUs, including for example those AMD EPYC 4005 Series ("Grado"), AMD EPYC 4004 Series ("Raphael"), AMD Ryzen 9000 Series ("Granite Ridge"), AMD Ryzen 9000 Series ("Fire Range"), AMD Ryzen 8000G Series ("Phoenix"), AMD Ryzen 8040 Series ("Hawk Point"), AMD Ryzen 8000HX Series ("Dragon Range Refresh"), AMD Ryzen 7000 Series ("Raphael"), AMD Ryzen 7020 Series ("Mendocino"), AMD Ryzen 7030 Series ("Barcelo-R"), AMD Ryzen 7035 Series ("Rembrandt-R"), AMD Ryzen 7040 Series ("Phoenix"), AMD Ryzen 7045 Series ("Dragon Range"), AMD Ryzen 6000 Series ("Rembrandt"), AMD Ryzen 5000 Series ("Cezanne"), AMD Ryzen 5000 Series ("Lucienne"), AMD Ryzen 4000 Series ("Renoir"), AMD Ryzen AI 400 Series ("Gorgon Point"), AMD Ryzen AI Max 300 Series ("Strix Halo"), AMD Ryzen AI 300 Series ("Strix"), AMD Ryzen 200 Series ("Phoenix-Derived"), AMD Ryzen 100 Series ("Rembrandt-Derived"), AMD Ryzen 10 Series ("Mendocino-Class"), AMD Ryzen Embedded V2000 Series ("Grey Hawk"), AMD Ryzen Z1 Series ("Phoenix"), AMD Ryzen Z2 Series ("Strix"), AMD Athlon Series ("Mendocino"), AMD Instinct MI350 Series, AMD Instinct MI300 Series, AMD Instinct MI200 Series, AMD Instinct MI100 Series, AMD Instinct MI50 Series, AMD Instinct MI60 Series, AMD Instinct MI25 Series, AMD Instinct MI8 Series, and AMD Instinct MI6 Series that incorporate integrated GPUs.

---

[32] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which the AMD Instinct MI300A infringes.

75.    The Accused Products include and comprise an apparatus comprising a central processing component ("CPC") having a computing core. As one non-limiting example, the AMD Instinct MI300A is an Accelerated Processing Unit ("APU") that integrates twenty-four x86-architecture "Zen 4" CPU cores across three CPU chiplets.



**Breakthrough discrete APU for HPC and AI**

Based on next-generation AMD CDNA™ 3 architecture, the AMD Instinct™ MI300A accelerated processing unit (APU) is designed to deliver outstanding efficiency and performance for the most-demanding HPC and AI applications. The APU is built from the ground up to overcome the challenges that discrete GPUs present: performance bottlenecks from the narrow interfaces between CPU and GPU, burdensome programming overhead for managing data, and the need to refactor and recompile code for every GPU generation. The AMD Instinct MI300A integrates 24 AMD 'Zen 4' x86 CPU cores with 228 AMD CDNA™ 3 high-throughput GPU compute units, 128 GB of unified HBM3 memory that presents a single shared address space to CPU and GPU, all of which are interconnected into the coherent 4th Gen AMD Infinity architecture. Slated for next-generation supercomputers, this technology is available to enterprise data centers through platforms offered by our solution partners.

AMD Instinct MI300A APU Data Sheet (Pub. GD-176) ("MI300A Data Sheet"), p. 1

Each Zen 4 CPU core constitutes a computing core capable of executing instructions independently. The MI300A combines these CPU cores with 228 CDNA3 high-throughput GPU compute units in a heterogenous multi-chip architecture, where CPU chiplets form a CPC and include computing cores that execute general-purpose x86 instructions and coordinate workloads across the device.

76.    The Accused Products include and comprise an apparatus comprising a coherent memory bus coupled to the CPC. As one non-limiting example, the AMD Instinct MI300A utilizes the fourth generation AMD Infinity Fabric as a coherent memory bus to connect CPU chiplets, GPU compute complexes, and memory subsystems. The Infinity Fabric provides hardware-supported cache coherence across CPU and GPU components, enabling cache-coherent memory access between the CPU cores and GPU compute units.

**COMMUNICATION AND SCALING**

To build the world's largest exascale-class supercomputers and AI systems that can advance the state-of-the-art, a single processor is never enough. Instead architects must focus on the entire system – from the chip to the platform design to the rack and then to data center level. The AMD CDNA™ 2 architecture was a dramatic leap forward in capabilities adopting the 3rd Gen AMD Infinity architecture, including AMD Infinity Fabric™ technologies within package, between packages, and to host processors. The AMD CDNA 3 architecture takes communication and scaling to the next level using the 4th Gen Infinity architecture fabric more prolifically inside the package and enhances the efficiency and performance across the board. However, the heterogeneous integration for the AMD CDNA 3 family gives AMD the unique opportunity to push scalability in two different directions with the AMD Instinct™ MI300X and MI325X discrete GPUs and the AMD Instinct MI300A APU.

For AMD CDNA 3 architecture, the communication links have been systematically enhanced to operate at up to 32Gbps and redistributed across the IODs. Each IOD includes two 16-lane, bi-directional inter-package AMD Infinity Fabric links for connecting to other AMD accelerators. One of the links is multi-purpose and can be configured to act as a x16 PCIe® Gen 5 for pure I/O functionality.

Introducing AMD CDNA 3 Architecture and MI300 Series
(PID# 2258402-B, © 2025) ("CDNA 3 White Paper"), p. 15

77.    The Accused Products include and comprise an apparatus comprising a memory coupled to the coherent memory bus. As one non-limiting example, AMD Instinct MI300A includes unified HBM3 memory shared coherently between CPU and GPU components. The HBM3 memory is coupled to the coherent Infinity Fabric interconnect, enabling both CPU cores and GPU compute units to access a shared coherent memory address space. The MI300A further includes a 256 MB shared AMD Infinity Cache accessible by both CPU and GPU clients.



CDNA 3 White Paper, p. 9

78. The Accused Products include and comprise an apparatus comprising a communication bus coupled to the coherent memory bus. As one non-limiting example, within the AMD Instinct MI300A, Infinity Fabric links serve as a communication bus that couples the GPU Accelerator Complex Dies (which contains the GPU computational elements of the processor along with the lower levels of the cache hierarchy ("GPU XCDs")) to the coherent memory bus. Each GPU XCD connects through dedicated Infinity Fabric links to the I/O Die ("IOD"), which houses the data fabric of a coherent memory bus. These intra-package communication links provide high-bandwidth coherent communication paths between the specialized hardware components and the coherent interconnect fabric.

79. The Accused Products include and comprise an apparatus comprising a specialized hardware component ("SHC") coupled to the communication bus. As one non-limiting example, the AMD Instinct MI300A contains six GPU XCDs, each containing 38 CDNA3-based GPU compute units. The GPU XCDs constitute specialized hardware components coupled to the communication bus through dedicated Infinity Fabric links. The Infinity Fabric links connect each GPU XCD to the IOD and its associated data fabric, enabling the GPU compute units to, *inter alia*, access system memory and communicate with the CPU cores (as well as providing remote memory access and GPU virtualization).

80. The Accused Products include and comprise an apparatus comprising an SHC tracker coupled to the coherent memory bus. As one non-limiting example, the AMD Instinct MI300A includes a Data Fabric Performance Monitoring Unit ("DF PMU") that includes, *inter alia*, control and counter registers and tracks coherent transactions including each GPU XCD. The DF PMU constitutes an SHC tracker coupled to the coherent memory bus.

81.    The Accused Products include and comprise an apparatus wherein the SHC tracker is configured to allocate a counting register for storing a count of events of the SHC. As one non-limiting example, the DF PMU in the AMD Instinct MI300A allocates counting registers through, *e.g.*, the Data Fabric Performance Event Counter registers. Each counter register provides a 48-bit wide performance counter value that stores event counts. Allocation of the counting registers enables the DF PMU to store counts of events related to the SHC, including coherent data-fabric transactions originating from or directed to the GPU XCDs.

82.    The Accused Products include and comprise an apparatus wherein the SHC tracker is configured to detect an event of the SHC. As one non-limiting example, the DF PMU in the AMD Instinct MI300A detects events of the SHC through the Data Fabric Performance Event Select registers. As one non-limiting example, the EventSelect field combines to form an event select field that specifies the event or event duration to be counted. The UnitMask field further specifies or qualifies the event specified by EventSelect, and all events selected by UnitMask are simultaneously monitored. The AMD Instinct MI300A DF PMU is configured to actively detect the specified events of the SHC, including coherent transactions issued by the GPU XCDs across the data fabric.

83.    The Accused Products include and comprise an apparatus wherein the SHC tracker is configured to update the counting register with a count related to the event of the SHC. As one non-limiting example, when the DF PMU in the AMD Instinct MI300A detects an event matching the configured EventSelect and UnitMask values, it updates the corresponding Data Fabric Performance Counter register. The counter register's field stores the current value of the event counter, which is incremented each time the specified event occurs. The counter value accumulates

a running count of detected events related to the SHC, such as coherent data-fabric transactions originating from the GPU XCDs.

84.     The Accused Products include and comprise an apparatus wherein the SHC tracker is configured to send counts from the counting register to another apparatus. As one non-limiting example, when any CPU core issues an RDMSR or RDPMC instruction targeting one of the DF Performance Counter registers, the DF PMU transmits the stored count value from the counting register across the coherent Infinity Fabric to the requesting CPU core. Because the DF Performance Monitors are shared by all cores and threads in the node, any core may request and receive the counter values, and system-level monitoring software may direct any core to read the counters on its behalf.

85.     By making, using, offering for sale, selling, testing, making available, and/or marketing products in the United States, and/or importing products into the United States, including but not limited to the Accused Products, AMD has injured Caprock and is liable to Caprock for directly infringing one or more claims of the '692 Patent, including at least Claim 1, pursuant to 35 U.S.C. § 271(a).

86.     In addition to direct infringement, AMD also indirectly infringes the '692 Patent under 35 U.S.C. § 271(b). AMD has actively encouraged and taken active steps and overt acts to encourage its customers to directly infringe the '692 Patent by using, selling, testing, offering for sale, making available, marketing, and/or importing the Accused Products or products containing the Accused Products. AMD through its sales, engineering, marketing, and technical staff, as well as its Partner Network, actively encourages its customers to purchase the infringing Accused Products, use the Accused Products in a manner that directly infringes, and/or incorporate the Accused Products into customers' own products. AMD also actively encourages and facilitates

direct infringement by providing ongoing technical support for the Accused Products, including driver and firmware updates that further enable direct infringement by AMD's customers. AMD also provides its customers with detailed technical documentation, white papers, tuning guides, architecture overviews, product briefs, and marketing materials that instruct and encourage customers to deploy and use the Accused Products in configurations where the patented SHC tracking is performed, thereby directly infringing the '692 Patent. AMD's own technical literature describes how the DF PMU allocates counting registers for storing counts of events related to the SHC—the same tracking functionality claimed by the '692 Patent. AMD also purposefully and knowingly sells and offers to sell the Accused Products to its distributors, contract manufacturers, and/or customers knowing and expecting that the Accused Products or products containing them will be imported, used, sold, and/or offered for sale by those distributors, contract manufacturers, customers, and/or other end users.

87.    As a result of AMD's active encouragement and intentional inducement, its customers have committed acts directly infringing the '692 Patent. AMD has known that its customers' acts constituted direct infringement of at least one claim of the '692 Patent since the filing of this complaint.

88.    Moreover, AMD intends to cause, and has taken affirmative steps to induce, infringement by distributors, contract manufacturers, customers, and/or other end users by at least, *inter alia*, encouraging, promoting, instructing, and/or directing the infringing use of the Accused Products.

89.    As detailed above, the AMD Instinct MI300A and other Accused Products infringe at least Claim 1 of the '692 Patent. Accordingly, by encouraging, promoting, instructing, and/or

directing users to use the AMD Instinct MI300A and other Accused Products, AMD is actively inducing infringement of the '692 Patent in violation of 35 U.S.C. § 271(b).

90.    AMD is likewise liable as a contributory infringer of the '692 Patent under 35 U.S.C. § 271(c). AMD has offered to sell and/or sold within the United States the AMD Instinct MI300A Series and other Accused Products that practice the '692 Patent. The Accused Products comprise an SHC tracker coupled to a coherent memory bus, which constitutes a material part of the '692 Patent's invention, that can be incorporated into computing systems, servers, and other computing devices. AMD has known such Accused Products to be especially adapted for practicing at least one claim of the '692 Patent, where the Accused Products are not staple articles nor a commodity of commerce suitable for substantial non-infringing use.

91.    As a result of AMD's infringement of the '692 Patent, Caprock has suffered and will continue to suffer monetary damages and seeks recovery in an amount adequate to compensate for AMD's past, present, and future infringement, but in no event less than a reasonable royalty, together with pre- and post-judgment interest, attorneys' fees, and costs as fixed by the Court under 35 U.S.C. §§ 284 and 285.

**COUNT 3:**
**INFRINGEMENT OF U.S. PATENT NO. 10,627,888**

92.    Caprock repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

93.    AMD has directly infringed and continues to directly infringe the '888 Patent in violation of 35 U.S.C. § 271(a) by, either literally or through the doctrine of equivalents, making, using (including internal use and testing), selling, offering to sell, making available, marketing, and/or importing in or into the United States, without authorization, products that practice one or more claims of the '888 Patent, including at least exemplary Claims 1 and 12 as set forth below.

94.    For example, Claim 1 of the '888 Patent recites as follows:

A method of optimizing power consumption in an electrical device, the method comprising:

receiving, by a processor, instructions to enter a wait state, wherein the instructions include a sleep decision index comprising a sleep operation code, a parameter, and a state;

monitoring, by the processor, the parameter specified by the sleep decision index;

initiating, by the processor, instructions to enter a low-power mode based on a determination that the parameter has met a value specified by the sleep decision index, wherein the value is determined based on a history of previous events or states and wherein the determination is based on applying an algorithm specified by the sleep operation code to the parameter;

initiating, by the processor, instructions to exit the low-power mode based on the parameter; and

providing, via a user interface, a user with notice of a current state.

95.    Claim 12 of the '888 Patent recites as follows:

A system, comprising:

a memory having computer readable instructions; and a processor for executing the computer readable instructions, the computer readable instructions including:

receiving instructions to enter a wait state, wherein the instructions include a sleep decision index comprising a sleep operation code, a parameter and a state;

monitoring a parameter specified by the sleep decision index to enter a wait state;

initiating instructions to enter a low-power mode based on a determination that the parameter has met a value specified by the sleep decision index, wherein the value is determined based on a history of previous events or states and wherein

the determination is based on applying an algorithm specified by the sleep operation code to the parameter;

initiating instructions to exit a low-power mode based on the parameter; and

providing, via a user interface, a user with notice of a current state.

96.     The exemplar AMD EPYC 9004 device made and sold by AMD meets every element of these claims.[33] At a minimum, the '888 Patent Accused Products include AMD EPYC 9005 Series ("Turin"), AMD EPYC 9004 Series ("Genoa"), AMD EPYC 97x4 Series ("Bergamo"), AMD EPYC 8004 Series ("Siena"), AMD EPYC 7003 Series ("Milan"), AMD EPYC 7002 Series ("Rome"), AMD EPYC 4005 Series ("Grado"), AMD EPYC 4004 Series ("Raphael"), AMD EPYC 2005 Series ("Fire Range"), AMD Ryzen 9000 Series ("Granite Ridge"), AMD Ryzen 9000 Series ("Fire Range"), AMD Ryzen 8000G Series ("Phoenix"), AMD Ryzen 8040 Series ("Hawk Point"), AMD Ryzen 8000HX Series ("Dragon Range Refresh"), AMD Ryzen 7000 Series ("Raphael"), AMD Ryzen 7020 Series ("Mendocino"), AMD Ryzen 7030 Series ("Barcelo-R"), AMD Ryzen 7035 Series ("Rembrandt-R"), AMD Ryzen 7040 Series ("Phoenix"), AMD Ryzen 7045 Series ("Dragon Range"), AMD Ryzen 6000 Series ("Rembrandt"), AMD Ryzen 5000 Series ("Vermeer"), AMD Ryzen 5000 Series ("Cezanne"), AMD Ryzen 5000 Series ("Lucienne"), AMD Ryzen 4000 Series ("Renoir"), AMD Ryzen 3000 Series ("Matisse"), AMD Ryzen AI 400 Series ("Gorgon Point"), AMD Ryzen AI Max 300 Series ("Strix Halo"), AMD Ryzen AI 300 Series ("Strix"), AMD Ryzen 200 Series ("Phoenix-Derived"), AMD Ryzen 100 Series ("Rembrandt-Derived"), AMD Ryzen 10 Series ("Mendocino-Class"), AMD Ryzen Embedded V2000 Series ("Grey Hawk"), AMD Ryzen Z1 Series

---

[33] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which the AMD EPYC 9004 infringes.

("Phoenix"), AMD Ryzen Z2 Series ("Strix"), AMD Ryzen Threadripper 9000 Series ("Shimada Peak"), AMD Ryzen Threadripper 7000 Series ("Storm Peak"), AMD Ryzen Threadripper 5000 Series ("Chagall"), AMD Ryzen Threadripper 3000 Series ("Castle Peak"), AMD Athlon Series ("Mendocino").

97.    As an example, the Accused Products practice each element of Claim 1.

98.    Thus, the Accused Products practice a method of optimizing power consumption in an electrical device. As one non-limiting example, the AMD EPYC 9004 Series processors, *i.e.*, server and data center computing platforms are electrical devices that optimize power consumption through, *e.g.*, dynamic processor frequency scaling. AMD EPYC 9004 Series processors utilize Zen 4 CPU cores which support amd-pstate driver and System Management Unit ("SMU") firmware to continuously calculate and adjust processor clock frequency through P-state (Performance State) transitions. By transitioning between P-states, the processor selects lower-frequency states to reduce power consumption when workload conditions permit, and higher-frequency states to increase performance when needed, thereby optimizing power consumption in the electrical device.

99.    The Accused Products practice a method of receiving, by a processor, instructions to enter a wait state. As one non-limiting example, the AMD EPYC 9004 Series processors utilize the amd-pstate driver and the SMU firmware to calculate and adjust processor clock frequency through P-state transitions. The amd-pstate driver provides performance targets and energy preferences to the SMU firmware via the processor's Model-Specific Registers ("MSRs"). The processor can be transitioned from a first P-state to a second, lower-power P-state, which corresponds to the wait state.

100.    The Accused Products practice a method wherein the instructions to enter a wait state include a sleep decision index comprising a sleep operation code, a parameter, and a state. As one non-limiting example, in the AMD EPYC 9004 Series processors, the amd-pstate driver selects an operating mode (e.g., non-autonomous mode) and provides an Energy Performance Preference ("EPP") as a hint in the processor's MSR registers. The driver operating mode and EPP together constitute a sleep operation code that determines how the SMU processes power management decisions. The SMU firmware uses performance targets provided by the amd-pstate driver to calculate a filtered activity value through an exponential moving average formula. This filtered activity formula constitutes the parameter. The previously calculated moving average value constitutes the state. Together, the sleep operation code, parameter, and state form a sleep decision index.

101.    The Accused Products practice a method of monitoring by the processor, the parameter specified by the sleep decision index. As one non-limiting example, in the AMD EPYC 9004 Series Processors the SMU continuously adjusts the clock frequency. To do so, it recalculates the filtered activity value at each time step. This continuous recalculation constitutes monitoring of the parameter specified by the sleep decision index by the SMU and thus the processor.

102.    The Accused Products practice a method of initiating, by the processor, instructions to enter a low-power mode based on a determination that the parameter has met a value specified by the sleep decision index. As one non-limiting example, in AMD EPYC 9004 Series processors, the SMU implements a frequency control algorithm that calculates a new clock frequency at each time step. The filtered activity value may, *e.g.*, reach a point where the resulting error, after processing by a proportional-derivative ("PD") controller, produces a negative output. This negative PD output causes the calculated frequency to decrease below the current frequency,

triggering instructions for the processor's transition from the second P-state (a wait state) to a third P-state with even lower power consumption (a power-saving mode). The filtered activity value that triggers this transition is specified by the sleep decision index; it depends on the state and information about the parameter transmitted to the processor as part of the sleep decision index.



A New CPU Frequency Control Mechanism on Linux, Open Source Summit Europe 2022—LinuxCon (© 2022) ("AMD P-State Presentation"), slide 5

103. The Accused Products practice a method of initiating described above wherein the value is determined based on a history of previous events or states. As one non-limiting example, in AMD EPYC 9004 Series processors, the SMU calculates the filtered activity value using an alpha filter (with quantity alpha) that weights the current processor activity against the previously calculated historical value. This exponential moving average formula incorporates the previous calculated average at each time step, and thus the value of the filtered activity parameter is determined based on a history of previous events or states.

104. The Accused Products practice a method of initiating described above wherein the determination is based on applying an algorithm specified by the sleep operation code to the

parameter. As one non-limiting example, in AMD EPYC 9004 Series processors, the driver operating mode and EPP, *i.e.*, a sleep operation code, determine which algorithm the SMU applies to calculate the processor's clock frequency. The SMU applies this algorithm to the filtered activity value, *i.e.*, the parameter, through the frequency control formula, including the alpha filter and PD controller, to determine whether the processor should transition to a lower-power P-state.

105.    The Accused Products practice a method of initiating, by the processor, instructions to exit the low-power mode based on the parameter. As one non-limiting example, in AMD EPYC 9004 Series processors, the SMU continuously calculates new frequency values according to the frequency control algorithm. When the filtered activity value causes the calculated clock frequency to exceed the previous clock frequency, the SMU increases the processor's clock frequency accordingly, transitioning the processor to a higher-power P-state. This increase in frequency corresponds to exiting the low-power mode based on the parameter.

106.    The Accused Products practice a method of providing, via a user interface, a user with notice of a current state. As one non-limiting example, AMD EPYC 9004 Series processors provide users with notice of the current P-state through multiple interfaces, including, *e.g.*, from the processor's P-state register.

> *Current P-State (CurPstate)*—Bits 3:0. This field provides the current P-state of the CPU core regardless of the source of the P-state change, including writes to the P-State Control Register: 0 = P-state 0, 1 = P-state 1, etc. The value of this field is updated when the frequency transitions to a new value associated with the P-state. Reset value is implementation specific.

AMD64 Architecture Programmer's Manual Volume 2 : System Programming
(Pub. 24593 Rev. 3.41—November 2023) ("AMD64 Manual Vol. 2"), p. 666

> imum operating frequencies supported by the hardware. Users can check the `scaling_cur_freq` information comes from the `CPUFreq` core.

Huang Rui, "amd-pstate CPU Performance Scaling Driver," The Linux Kernel Documentation,
https://docs.kernel.org/admin-guide/pm/amd-pstate.html ("Kernel amd-pstate Documentation")

The AMD EPYC 9004 Series processors also provide, at the user-space level, the AMD P-State Tracer Tool, which displays how much time was spent in each P-state and can display processor frequency as a function of time.



AMD P-State Presentation, slide 9

*linux/tools/power/x86/amd_pstate_tracer*. As root this Python script can record traces looking at the performance behavior of P-State and then report details how much time was spent in each performance state and other details on the behavior.

Michael Larabel, "AMD P-State Tracer Tool To Be Included With Linux 5.18," Phoronix (Mar. 2022), https://www.phoronix.com/news/AMD-P-State-Tracer ("Phoronix P-State Tracer Article")



AMD P-State Presentation, slide 15

Additionally, TurboStat provides statistics displaying the processor frequency corresponding to the current P-state.



AMD P-State Presentation, slide 17

These tools provide users with notice of the processor's current state via a user interface.

107.    The Accused Products also practice each element of Claim 12.

108.    Claim 12 is an independent system claim that recites substantially the same elements of method Claim 1 but recites a system comprising a memory having computer readable instructions, and a processor for executing those instructions, with such instructions including the same steps recited in Claim 1. The Accused Products satisfy each of these separate elements of

Claim 12 as set forth below, with the instruction step elements of Claim 12 satisfied for the same reasons described above with respect to Claim 1.

109.    The Accused Products comprise a system including a memory having computer readable instructions. As one non-limiting example, AMD EPYC 9004 Series processors are systems on chip (SoC) that integrate processor cores, memory controllers, input/output (I/O) controllers, and security features into a single integrated design. Furthermore, AMD EPYC 9004 Series processors include multiple levels of memory, including L1 instruction cache, L1 data cache, private unified instruction/data L2 cache, L3 cache, and DDR5 system memory. These memories store computer readable instructions, including the amd-pstate driver and the SMU firmware that implement the power management functions described above.

## 'ZEN 4' CPU DIE

The 'Zen 4' CPU die used in EPYC 9004 and 4004 Series processors consists of up to eight cores, dedicated 1 MB L2 cache per core, and a 16 or 32 MB cache shared between the cores (Figure 2). This die can be augmented with 3D V-Cache technology to bring the L3 cache capacity to 96 MB.



Figure 2:  A 'Zen 4' CPU die with 8 cores per die includes a 32 MB
cache; with 4 or fewer cores it is equipped with a 16 MB cache

- **DDR5 MEMORY CONTROLLERS** – Twelve in the EPYC 9004 Series.
  50% more memory controllers than any other x86 CPU.EPYC-033A

*See* 4th Gen AMD EPYC Processor Architecture White Paper (May 2024)
("EPYC May 2024 White Paper"), p. 4, 10:

110.    The Accused Products comprise a processor for executing the computer readable instructions. As one non-limiting example, AMD EPYC 9004 Series processors are based on the Zen 4 compute core, which executes computer readable instructions, including the amd-pstate driver instructions and power management routines. The SMU, a dedicated processing unit residing on the processor's I/O die, likewise executes the SMU firmware instructions that implement the frequency control algorithm and P-state transitions described above.

111.    The computer readable instructions stored in the memory of the Accused Products constitute instructions that, when executed by the processor, perform each of the functional steps recited in Claim 12, including: receiving instructions to enter a wait state wherein the instructions include a sleep decision index comprising a sleep operation code, a parameter, and a state;

monitoring a parameter specified by the sleep decision index to enter a wait state; initiating instructions to enter a low-power mode based on a determination that the parameter has met a value specified by the sleep decision index, wherein the value is determined based on a history of previous events or states and wherein the determination is based on applying an algorithm specified by the sleep operation code to the parameter; initiating instructions to exit a low-power mode based on the parameter; and providing, via a user interface, a user with notice of a current state. Each of these functional steps is satisfied for the same reasons and based on the same accused functionality described above in connection with Claim 1.

112.    By making, using, offering for sale, selling, testing, making available and/or marketing products in the United States, and/or importing products into the United States, including but not limited to the Accused Products, AMD has injured Caprock and is liable to Caprock for directly infringing two or more claims of the '888 Patent, including at least Claims 1 and 12, pursuant to 35 U.S.C. § 271(a).

113.    In addition to direct infringement, AMD also indirectly infringes the '888 Patent under 35 U.S.C. § 271(b). AMD has actively encouraged and taken active steps and overt acts to encourage its customers to directly infringe the '888 Patent by using, selling, testing, offering for sale, marketing, making available, and/or importing the Accused Products or products containing the Accused Products. AMD through its sales, engineering, marketing, and technical staff, as well as its Partner Network, actively encourages its customers to purchase the infringing Accused Products, use the Accused Products in a manner that directly infringes, and/or incorporate the Accused Products into customers' own products. AMD also actively encourages and facilitates direct infringement by providing ongoing technical support for the Accused Products, including driver and firmware updates that further enable direct infringement by AMD's customers. AMD

also provides its customers with detailed technical documentation, white papers, tuning guides, architecture overviews, product briefs, and marketing materials that instruct and encourage customers to deploy and use the Accused Products in configurations where the patented power management functionality is performed, thereby directly infringing the '888 Patent. AMD's own technical literature describes how the amd-pstate driver and SMU firmware implement power-saving decision-making based on a sleep decision index—the same power management functionality claimed by the '888 Patent. AMD also purposefully and knowingly sells and offers to sell the Accused Products to its distributors, contract manufacturers, and/or customers knowing and expecting that the Accused Products or products containing them will be imported, used, sold, and/or offered for sale by those distributors, contract manufacturers, customers, and/or other end users.

114. As a result of AMD's active encouragement and intentional inducement, its customers have committed acts directly infringing the '888 Patent. AMD has known that its customers' acts constituted direct infringement of at least two claims of the '888 Patent since the filing of this complaint.

115. Moreover, AMD intends to cause, and has taken affirmative steps to induce, infringement by distributors, contract manufacturers, customers, and/or other end users by at least, *inter alia*, encouraging, promoting, instructing, and/or directing the infringing use of the Accused Products.

116. As detailed above, the AMD EPYC 9004 and other Accused Products infringe at least Claims 1 and 12 of the '888 Patent. Accordingly, by encouraging, promoting, instructing, and/or directing users to use the AMD EPYC 9004 and other Accused Products, AMD is actively inducing infringement of the '888 Patent in violation of 35 U.S.C. § 271(b).

117.    AMD is likewise liable as a contributory infringer of the '888 Patent under 35 U.S.C. § 271(c). AMD has offered to sell and/or sold within the United States the AMD EPYC 9004 Series and other Accused Products that practice the '888 Patent. The Accused Products comprise the amd-pstate driver and SMU firmware implementing P-state power management through a sleep decision index, which constitutes a material part of the '888 Patent's invention, that can be incorporated into computing systems, servers, and other computing devices. AMD has known such Accused Products to be especially adapted for practicing at least one claim of the '888 Patent, where the Accused Products are not staple articles nor a commodity of commerce suitable for substantial non-infringing use.

118.    As a result of AMD's infringement of the '888 Patent, Caprock has suffered and will continue to suffer monetary damages and seeks recovery in an amount adequate to compensate for AMD's past, present, and future infringement, but in no event less than a reasonable royalty, together with pre- and post-judgment interest, attorneys' fees, and costs as fixed by the Court under 35 U.S.C. §§ 284 and 285.

## **DEMAND FOR JURY TRIAL**

119.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Caprock hereby demands a trial by jury for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Caprock requests entry of judgment in its favor and against Defendant AMD as follows:

A.      Declaring that AMD has directly infringed, either literally and/or under the doctrine of equivalents, and continues to directly infringe United States Patent Nos. 9,384,086, 10,185,692, and 10,627,888 in violation of 35 U.S.C. § 271(a);

B.      Declaring that AMD has induced infringement, and continues to induce infringement, of United States Patent Nos. 9,384,086, 10,185,692, and 10,627,888 in violation of 35 U.S.C. § 271(b);

C.      Declaring that AMD has contributorily infringed, and continues to contributorily infringe, United States Patent Nos. 9,384,086, 10,185,692, and 10,627,888 in violation of 35 U.S.C. § 271(c);

D.      Declaring that AMD's infringement has been willful and deliberate;

E.      Awarding all damages to Caprock arising out of AMD's acts of infringement, in an amount no less than a reasonable royalty for Defendant's infringement of each Asserted Patent together with prejudgment, post-judgment interest, and costs without limitation under 35 U.S.C. § 284;

F.      Enhancing damages pursuant to 35 U.S.C. § 284;

G.      Declaring that royalties shall be payable on each and every future sale by AMD of a product that is found to infringe one or more of the Asserted Patents and on all future products that are not colorably different from products found to infringe;

H.      Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

I.      Awarding such other costs and further relief the Court deems just and proper.

Date: June 4, 2026                                Respectfully submitted,


                                                  /s/ Mark D. Siegmund
                                                  Mark D. Siegmund
                                                  Texas Bar No. 24117055
                                                  CHERRY JOHNSON SIEGMUND JAMES PC
                                                  7901 Fish Pond Rd, Suite 200
                                                  Waco, TX 76710-1013
                                                  Telephone: (254) 732-2242
                                                  Facsimile: 866-627-3509
                                                  Email: msiegmund@cjsjlaw.com

                                                  Shawn Blackburn
                                                  Texas Bar No. 24089989
                                                  SUSMAN GODFREY LLP
                                                  1000 Louisiana, Suite 5100
                                                  Houston, TX 77002
                                                  Phone: (713) 651-9366
                                                  Fax:    (713) 654-6666
                                                  sblackburn@susmangodfrey.com

                                                  Steven M. Seigel
                                                  Washington Bar No. 53960
                                                  SUSMAN GODFREY LLP
                                                  401 Union Street, Suite 3000
                                                  Seattle, Washington 98101
                                                  Tel: (206) 516-3880
                                                  Fax: 206-516-3883
                                                  sseigel@susmangodfrey.com

                                                  Lea Haddad*
                                                  California Bar No. 362871
                                                  SUSMAN GODFREY LLP
                                                  1900 Avenue of the Stars, Suite 1400
                                                  Los Angeles, CA 90067
                                                  Phone: (310) 789-3100
                                                  Fax: (310) 789-3150
                                                  lhaddad@susmangodfrey.com

                                                  **COUNSEL    FOR    PLAINTIFF    CAPROCK
                                                  INTEGRATED TECHNOLOGIES, LLC**

                                                  *pro hac vice admission pending*

52